FILED
12/14/21 2:59 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| RUTHELLEN W. RICKERSON, | : | Case No. 21-10315-TPA |
| *Debtor* | : | |
| | : | Chapter 11 |
| NATIONAL LOAN INVESTORS, L.P., | : | |
| *Movant* | : | Related to Doc. No. 28 |
| | : | |
| v. | : | |
| | : | |
| RUTHELLEN W. RICKERSON and | : | |
| JOHN C. MELARAGNO, | : | |
| *Respondents* | : | |

_____

| | | |
|---|---|---|
| UNITED STATES TRUSTEE, | : | Related to Doc. No. 37 |
| *Movant* | : | |
| | : | |
| v. | : | |
| | : | |
| RUTHELLEN W. RICKERSON, | : | |
| *Respondent* | | |

**<u>MEMORANDUM OPINION</u>**

*Appearances:* Beverly Weiss Manne, Esq. for the Movant, National Loan Investors, L.P.
Norma Hildenbrand, Esq., for the Movant, United States Trustee
David L. Fuchs, Esq., for the Debtor/Respondent

The matters presently before the Court present a question of first impression in this

District under Chapter 11, Subchapter V, *11 U.S.C. §§1181 - 1195* ("Subchapter V"). Subchapter

V, entitled "Small Business Debtor Reorganizations," was added to the Bankruptcy Code by the

*Small Business Reorganization Act of 2019.* The primary issue before the Court is whether this

Debtor is eligible to proceed under Subchapter V. For the reasons explained below, the Court

1

concludes that the Debtor does not meet the requirements to proceed under Subchapter V.  A secondary issue is whether the case should be dismissed based on the Debtor's alleged inability to propose a feasible plan and her alleged  misuse of estate assets since the case was filed.  As to that, the Court concludes that, while there are certainly some troubling aspects to the case, it would be premature to dismiss the case at this early stage.  The Court will therefore strike Debtor's Subchapter V designation, redesignate the case as a "regular" Chapter 11 case, and deny the request for a dismissal at this time, without prejudice.

## *PROCEDURAL BACKGROUND*

The Debtor filed a voluntary bankruptcy petition under Chapter 11 on June 3, 2021. In Item 13 of her petition, Official Form 101, Debtor checked the box indicating that she is a "small business debtor" and has chosen to proceed under Subchapter V.  Two motions were filed in response to that designation.  First, creditor National Loan Investors, L.P. ("NLI") filed a ***Motion to Dismiss Chapter 11, Subchapter V Bankruptcy Case*** ("NLI Motion") on July 7, 2021, at Doc. No. 28.  Next, the United States Trustee filed a ***Motion to Strike Designation of Chapter 11 Case as Subchapter V under 11 U.S.C. §1182*** ("UST Motion," and collectively with the *NLI Motion*, "the Motions") on July 30, 2021 at Doc. No. 37. [1]

The *Motions* raise many similar points.  Both *Motions* claim that the Debtor does not fall within the definition of a "debtor" who is eligible to proceed under Subchapter V as set forth in *11 U.S.C. §1182(1)(A)*.  The *NLI Motion* asks that the case be dismissed as a result, or that in the

---

[1]

The Court has jurisdiction to decide the *Motions* pursuant to *28 U.S.C. §1334.*  The *Motions* are core matters under *28 U.S.C. §§157(b)(2)(A)* and *(O).*

alternative, the case be converted from one under Subchapter V to a "conventional" Chapter 11.  The *UST Motion* does not seek a dismissal of the case,  just that the Subchapter V designation be stricken, which as a practical matter would be the same result as NLI's non-dismissal alternative.  The *NLI Motion* further argues that the Debtor did not file the case in good faith, and that she will be unable to propose a feasible plan.  The Debtor filed Responses to the *Motions*, arguing that she is eligible to be a debtor under Subchapter V and asking that the *Motions* be denied.  *See*, Doc. Nos. 36, 45.

On September 28, 2021, the Parties filed a *Stipulation of Facts* ("Stipulation") at Doc. No. 68 which they agreed could be used for purposes of deciding the *Motions*.  They nevertheless requested that the Court conduct an evidentiary hearing because of some disputes over the nature of the Debtor's federal and state tax obligations.  That evidentiary hearing was held on October 14, 2021 and all Parties were given the opportunity to present evidence at that time, as well as to file post-trial briefs.  The *Motions* are now ripe for decision.

## FACTUAL BACKGROUND

The Debtor is a physician who specializes in obstetrics and gynecology.  She is employed as a "physician adviser" by an entity named OPTUM, a part of the United Health Group.  Her job duties with OPTUM are doing secondary admission reviews for hospital patients.  Debtor does not have any equity or ownership interest in OPTUM and is not a manager or officer of that company.  Debtor began working for OPTUM on a part-time basis in 2011 and at an unspecified point later in time that became a full-time position.  Her current gross monthly income from this employment is $13,925.

The Debtor is also an owner in three different legal entities, all created in or around late-1997, that were related to her former active practice as a treating ob-gyn physician in Titusville, Pennsylvania. The record is confusing as to the names of these entities, and details of their ownership structure, but it is clear that there were three of them, and also clear as to the purpose or role of each vis-a-vis the Debtor's former medical practice. One of the entities was Ruthellen D. Weeks, P.C., a professional corporation of which the Debtor was the 100% owner and president. *See, Stipulation* at ¶15. Ruthellen Weeks was the Debtor's name prior to her marriage and she still sometimes uses that name.[2] For purposes of this Opinion the Court will refer to this entity as the "Professional Corporation." The Debtor testified that the Professional Corporation was formed to serve as the vehicle to provide her with revenue from the ob-gyn practice. *See Transcript of Evidentiary Hearing* dated Oct. 14, 2021, at 46:21-47:1, Doc. No. 78, (hereinafter, "Tr. Trans. at ___").

A second entity was formed for conducting the actual medical practice itself. The *Stipulation of Facts* names that entity as "Women's Health Organization," or "WHO," *see* Doc. No. 68 at ¶7, but at the evidentiary hearing the Debtor testified that it was named "Women's Health Association" *see Tr. Transcript* at 46:7-20, and the Debtor's accountant, Christopher Anderson ("Anderson"), referred to it in his testimony as "Women's Health Association of Titusville," *id*. at 7:13-24. In order to avoid confusion, the Court will refer to this entity as the "Medical Company." As far as the ownership of the Medical Company, according to the *Stipulation*, the Debtor herself was a 50% owner of that entity, with the other 50% being owned by a Dr. Leonard A. Ferreira, who was the Debtor's partner in the practice. *Id*. at ¶7. However, at the evidentiary hearing Anderson

---

[2]

The bankruptcy petition identifies the Debtor as "Ruthellen W. Rickerson aka Ruthellen Weeks".

testified that Debtor's 50% share in the Medical Company was actually held by the Professional Corporation rather than by the Debtor in her individual capacity. Based on the testimony presented the Court finds that Anderson's explanation as to the ownership structure of the Medical Company is correct.

The third entity was a general partnership that owned the real estate at 602 W. Central Ave., Titusville, Pa. where the Medical Company operated its practice. The ownership of that entity was held 50% by the Debtor and her husband, Alfonso Rickerson, and 50% by Dr. Ferreira and his wife, Hillerinee Ferreira, with each pair of spouses holding their share as tenants by the entireties. According to the *Stipulation*, that entity was named "Women's Health Organization of Titusville, a/k/a Women's Health Association of Titusville," or "WHOT." *Id*. at ¶¶8-9. At the evidentiary hearing, however, the Debtor referred to this entity as "Women's Health Organization." *Tr. Trans*. at 45:8-19. Again, to avoid confusion, the Court will refer to this entity as the Real Estate Partnership.

It will be helpful at this point to take a short detour to explain how the acquisition of the 602 W. Center St. property was financed. The Real Estate Company borrowed $475,000 from PNC Bank for that purpose in late-1997. That loan was secured by a mortgage dated December 30, 1997, and recorded at Crawford County Record Book 369, page 948 on December 31, 1997. This mortgage includes the Debtor's residence located at 12348 North Perry Rd., Titusville, Pa. ("the Residence"). The mortgage was assigned to NLI on November 8, 2002, and recorded at Crawford County on December 4, 2002 at Instrument No. 200200018591. In 2017 there was a foreclosure and sheriff sale on the 602 W. Center St. property, as discussed below, but it was apparently not

sufficient to pay off the loan and as a result NLI then pursued the Residence. NLI obtained a judgment in mortgage foreclosure against the Residence on January 11, 2021, in the Crawford County Court of Common Pleas at Civil Action No. AD2103-106 in the amount of $339,201.63, which includes real estate tax advances made by NLI on the Residence in the amount of $11,678.24. It was an impending sheriff sale scheduled on the Residence that prompted the present bankruptcy filing by the Debtor.

Returning to the Debtor's prior medical practice, and to sum up, the Debtor and Dr. Ferreira practiced together as OB-GYN physicians in Titusville for a number of years beginning in late 1997. Three legal entities were created in connection with this activity. The Real Estate Partnership acquired and held real estate which it then rented to the Medical Company. The Medical Company, acting through the Debtor and Dr. Ferreira, provided medical services to patients and thereby generated revenue. The Debtor's share of this revenue was distributed to the Professional Corporation in its capacity as a 50% owner of the Medical Company. The Debtor provided medical services at the practice for the Professional Corporation, which paid her from the revenues it received from the Medical Company.

This general state of affairs continued until 2014 when for a number of reasons the medical practice was sold to a completely unrelated entity known as OB/GYN Associates of Erie. The Debtor was employed by that entity thereafter as a treating physician and continued seeing patients at the same location. That employment lasted for only a few months, however, and since that employment was terminated she has not engaged in any further medical practice treating patients and has only been employed by OPTUM. The real estate at 602 W. Center St. was not sold along with

6

the medical practice in the 2014 transaction. Instead, for a time OB/GYN Associates of Erie rented

that property from the Real Estate Company and conducted its medical practice there. The Debtor

was not sure how long that landlord/tenant relationship lasted, but in 2017 the 602 W. Center St.

property was sold at a sheriff sale. Thus, by 2017 neither the Medical Company nor the Real Estate

Company owned any assets or were conducting any business operations and that state of affairs has

remained true up to the present. Likewise, the Professional Corporation has been defunct for a

number of years, possibly beginning as early as 2013.


### DISCUSSION


As was noted above, Subchapter V was added to the Bankruptcy Code only recently,

becoming effective on February 19, 2020. Of chief concern in deciding the *Motions* is the definition

of the term "debtor" for purposes of Subchapter V, which provides in relevant part that the term:

> ... means a person engaged in commercial or business activities ... that
> has aggregate noncontingent liquidated secured and unsecured debts
> as of the date of the filing of the petition or the date of the order for
> relief in an amount not more than $7,500,000 (excluding debts owed
> to 1 or more affiliates or insiders) not less than 50 percent of which
> arose from the commercial or business activities of the debtor

*11 U.S.C. § 1182(1)(A)*.[3] Only persons who fall within the above definition are permitted to be

---

[3]

    At the inception of Subchapter V the applicable definition for eligibility thereunder was the
pre-existing definition for a "small business debtor" found at *11 U.S.C. §101(51D)*. However, the
*Coronavirus Aid, Relief and Economic Security Act* ("CARES Act") was enacted on March 27,
2020, and it amended *§ 1182(1)* to include a separate definition of "debtor" for Subchapter V
purposes that is identical to the definition of "small business debtor" in all respects except the debt
limitation is temporarily increased to $7,500,000. (H.R. Rep. No. 116-748 (2020)). Thus, cases
under Subchapter V construing the "small business debtor" definition under *Section 101(51D)* are
still relevant with respect to the current definition under *Section 1182(1)(A)*.

bankruptcy debtors under Subchapter V. *See 11 U.S.C. §103(I)*. In their *Motions* the Movants raise two arguments as to why the Debtor in this case does not qualify under this definition. First, they argue that she is not "a person engaged in commercial or business activities" within the meaning of the statute, pointing out that her previous business ventures related to the medical practice all terminated and ceased any operations a number of years ago, and that since then she has been only a W-2 employee of OPTUM, a company which she neither owns nor manages. Second, they argue that she cannot show that at least 50% of her debt arose from her commercial or business activities.

Before turning to the issue of the Debtor's eligibility to proceed under Subchapter V, a preliminary question is whether it is the Debtor's burden to establish that she is eligible, or the Movants' burden to show that she is not. It has generally been held that the burden of proof in establishing eligibility for bankruptcy relief lies with the party filing the bankruptcy petition. *See, In re Dille Family Trust,* 598 B.R. 179, 189 (Bankr. W.D. Pa. 2019)*.* The large majority of the cases that have considered issues of eligibility specific to Subchapter V have adopted that same view. *See, e.g., In re Blue,* 630 B.R. 179, 187 (Bankr. M.D.N.C. 2021) (citing cases), *In re Wright*, 2020 WL 2193240, at *2 (Bankr. D.S.C. Apr. 27, 2020). *But see, In re Body Transit, Inc*., 613 B.R. 400, 409 at n. 15 (Bankr. E.D. Pa. 2020) (placing burden of proof on party challenging debtor's eligibility to proceed under Subchapter V because in general the movant bears the burden of proof when requesting relief from the court). The Court believes the majority view on this issue to be the correct one and therefore finds that the Debtor has the burden of proof to demonstrate that she is eligible to proceed under Subchapter V.

### (A)   Whether Debtor is engaged in commercial
### or business activities

The key phrase "person engaged in commercial or business activities" from *Section 1182(1)(A)* may conveniently be broken down into three component parts: (1) person, (2) engaged in, (3) commercial or business activities.  The term "person" is defined in the Bankruptcy Code as including individuals, partnerships, and corporations.  *See 11 U.S.C. §101(41)*.  Debtor is an individual and clearly meets that component of the definition.  Unfortunately, the Bankruptcy Code does not provide any definitions for the remaining two components to be considered.  The Court must therefore  interpret the statutory language and apply it to the facts and circumstances as presented.

A court's primary purpose in statutory interpretation is to discern legislative intent, and it is assumed that Congress expresses its intent through the ordinary meaning of the language used.  Statutory interpretation therefore begins with an examination of the plain language of the statute, and if that language is unambiguous the court's inquiry is at an end.  *Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transp. Authority*, 539 F.3d 199, 210 (3d Cir. 2008). In addition to the statutory language itself, the Court must consider the specific context in which the language is used, the broader context of the statute as a whole, and the overall object and policy of the statute.  *Id*.  That is to say, statutory interpretation is a "holistic endeavor."  *In re KB Toys, Inc.*, 736 F.3d 247, 251 (3d Cir. 2013).  If the statutory language under consideration is ambiguous a court may consider the relevant legislative history, but the mere fact that the parties proffer different interpretations of the statutory language does not make the language ambiguous, it just makes the court's role more difficult in deciding which interpretation is persuasive.  *In re American Home Mortgage Holdings, Inc*., 637 F.3d 246, 256 (3d Cir. 2011).

The phrase "engaged in" seems clear enough on its face as requiring the person to be involved in or to take part in commercial or business activities. There is, however, an important temporal aspect of this phrase that must also be considered. That is to say, must a Subchapter V debtor be engaged in commercial or business activities at the time the bankruptcy case is filed, or is it sufficient that the debtor was engaged in commercial or business activities at some time in the past though she is no longer doing so at the time the petition is filed? In the Court's view, the most natural and apt plain language reading of this term as written in the statute imports a condition of contemporaneity into the definition. The Court therefore agrees with the following analysis:

> In common parlance, when a sentence is in the present tense, the term "engaged in" connotes that the thing is "presently engaged" in the activity. For example, to say that, "She is a member of an organization engaged in philanthropy," suggests that the group is actively and presently involved in philanthropic pursuits. There being no evidence to the contrary, it can be presumed that Congress employed the term in this common and generally understood manner.

*United States v. Barbeito*, 2010 WL 2243878, at *16 (S.D.W. Va. June 3, 2010).

The *Barbeito* court was construing the term "engaged in" as used in the federal "RICO" statute, but there are also cases that have reached a similar conclusion for the term as used with regard to Subchapter V. For example, in *In re Johnson*, 2021 WL 825156 (Bankr. N.D. Tex. March 1, 2021) the debtors sought to convert their Chapter 7 case to Chapter 11 and to proceed under Subchapter V based on their prior involvement in several oil and gas companies, all of which had failed prior to the debtors' bankruptcy filing. The debtors argued that there was no temporal requirement imposed by the "engaged in" language, and that since the bulk of their debt related to the past commercial and business activity they qualified under Subchapter V.

10

The *Johnson* court rejected the debtors' argument and gave three reasons for doing so. First, coming to the same conclusion as had the *Barbeito* court, it found that the ordinary meaning of a person "engaged in commercial or business activities" is "a person occupied with or busy in commercial or business activities – not a person who at some point in the past had such involvement." *Id*. at *6. Second, the court found that this interpretation was consistent with the specific context in which the language is used, noting that the small business debtor provisions of the Bankruptcy Code are designed to identify and help currently active businesses to successfully reorganize as a going concern, something which is "not essential to a small business that is no longer occupied with/busy in any commercial or business activities." *Id*. Third, the Court noted that Congress was not writing on a blank slate when Subchapter V was created because the Bankruptcy Code already included the same "engaged in" phrase in other contexts and it had been interpreted to include a present tense requirement, such that a debtor's past engagement in commercial or business activity was not sufficient. *Id.* at *7.

This third point raised by the *Johnson* court is particularly salient here because it is supported by *In re Pittsburgh & Lake Erie Properties, Inc.*, 290 F.3d 516 (3d Cir. 2002)("PLE"), which is instructive, and of course binding on this Court. The issue in *PLE* concerned Subchapter IV of Chapter 11, entitled "Railroad Reorganization." *See, 11 U.S.C. §§1161-1174.* The debtor in that case had been a railroad, but ceased operations and then filed for bankruptcy under Chapter 11. Two former employees of the Debtor who had been injured on the job filed proofs of claim against the bankruptcy estate, claiming priority status as administrative expense claims. In doing so they relied on *11 U.S.C. §1171(a)*, a provision in Subchapter IV that gives injured employees

11

administrative expense claim status for their injuries.  The debtor responded by arguing that Subchapter IV did not apply because it was no longer operating as a railroad when the bankruptcy was filed, and that therefore the claims of the employees should be treated as ordinary general unsecured claims.

The *PLE* court noted that Subchapter IV applies only to a "railroad," a term defined in *11 U.S.C. §101(44)* as a "common carrier by railroad *engaged in* the transportation of individuals or property or owner of trackage facilities leased by such a common carrier." (*Emphasis added*). The court concluded that because the debtor was not a railroad carrier or owner of leased trackage on the petition date it was not a railroad at that time.  The employees argued that the qualifications for Subchapter IV should be construed so as to include former railroads that were seeking adjustment of assets and liabilities obtained while they were railroads, but the court rejected  that view, finding it inconsistent with the "present tense 'engaged'" as used in the railroad definition. *Id*. at 519.

The *PLE* case thus strongly indicates that for a debtor to be eligible to proceed under Subchapter V it must be presently engaged in commercial or business activities.  In fact, if anything the case for finding so with respect to Subchapter V appears to be even stronger than it was in *PLE* with regard to Subchapter IV.  The provision delimiting the scope of eligible debtors for Subchapter IV  states that it applies "only in a case under [Chapter 11] concerning a railroad."  *11 U.S.C. §103(h).* The two injured employees seized on the word "concerning" and argued that Subchapter IV should  be available in any bankruptcy case dealing with facts having a historical source or connection to a railroad,  even if the debtor was no longer a railroad when the case was filed.  The

12

*PLE* court ultimately rejected that argument, though it conceded that the inclusion of the word "concerning" in *Section 103(h)* could possibly make the matter "somewhat ambiguous."  By contrast, the corresponding provision for Subchapter V, *Section 103(I)*,[4] does not include the word "concerning" or anything similar.

For the above reasons the Court agrees with *Johnson* and concludes that in order to be eligible to proceed under Subchapter V a debtor must be presently engaged in commercial or business activities.  *See also, In re Thurmon*, 625 B.R. 417 (Bankr. W.D. Mo. 2020) (debtors were not as a matter of fact or law engaged in commercial activities on the day they filed their bankruptcy because they had sold their business with no intent to return to it and were otherwise not active or involved in any commercial or business activities; keeping the empty business shell of the former business entity open with the state did not render them "engaged" in business activities."); *In re Offer Space, LLC*, 529 B.R. 299, 306 (Bankr. D. Ut. 2021) (debtor must be presently engaged in commercial or business activities on date of filing the petition); *In re Ikalowych,* 629 B.R. 261, 281 (Bankr. D. Col. 2021) ("engaged in" phrase means that a person or entity is presently doing something).  In so finding, the Court is aware that there is some contrary caselaw holding that past commercial or business activity by the debtor is sufficient to meet the Subchapter V eligibility requirement.  *See, e.g., In re Wright*, *supra,*  and *In re Blanchard*, 2020 WL 403 2411 (Bankr. E.D. La. July 16, 2020).  The Court does not find these cases persuasive on the point and rejects them.

---

[4]

*Section 103(I)* states: " Subchapter V of chapter 11 of this title applies only in a case under chapter 11 in which a debtor (as defined in section 1182) elects that subchapter V of chapter 11 shall apply."

13

Having concluded that the Debtor must be presently engaged in commercial or business activities, the Court next turns to the consideration of what is meant by "commercial or business activities." As with "engaged in," this term is not defined in the Bankruptcy Code and must be interpreted by the Court. Other courts have considered this same question and have reached varying conclusions. For instance, the court in *Johnson* found that by applying the ordinary meaning of the relevant words a person engaged in commercial or business activities is "a person engaged in the exchange or buying and selling of economic goods or services for profit." 2021 WL 825156.

Other courts have found that even if the debtor has ceased any actual buying and selling of goods and services for profit as of the time of the filing of the petition it can still be found to be presently engaged in commercial or business activities based on a totality of circumstances approach if it is still in the process of concluding the business. Thus, for example, in *Offer Space*, *supra*, at the time of filing the petition the debtor's business had no employees, was no longer actively operating in the manner it had previously, had no intention to reorganize, and it was intended to merely liquidate any remaining assets. On the other hand, as of the petition date the debtor had active bank accounts, had accounts receivable, was analyzing and exploring counterclaims in a pending lawsuit, was managing remaining assets, and was winding down its business. The *Offer Space* court found that these activities were sufficient to show the debtor was presently engaged in commercial or business activities. 629 B.R. at 306. *See also, e.g., In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233 (Bankr. S.D. Tex. 2021) (Chapter 11 debtor that, while no longer involved in business of producing and selling steam and electricity on the petition date, was actively pursuing litigation against a third party, seeking to collect on outstanding accounts

receivable, selling an asset, preserving asset value and having managers oversee the company while an independent contractor maintained its facility was still "engaged in commercial or business activities").

Although it strikes the Court as perhaps not unreasonable to conclude that a business that has ceased its normal operations, but which is in a winding down mode, may still be said to be engaging in commercial or business activities, the Court need not make that determination here. The Debtor did not present any evidence which could conceivably be found to show that the Medical Company, the Real Estate Company, or the Professional Corporation were engaged in any commercial or business activities at the time the petition was filed under even the most expansive reading of that term. The evidence that was presented instead showed that these entities had been completely inactive for several years by the time the petition was filed, with no assets, no employees, no accounts, and no ongoing activity of any type having occurred during that entire period. There was no evidence that the Debtor has any intent to ever reactivate any of these entities or to resume a medical practice.

The Debtor points to her current employment with OPTUM as constituting present commercial activity. To reiterate, the Debtor's current employment situation is a garden variety employee-employer relationship between the Debtor and OPTUM. In exchange for the work she does for OPTUM she receives pay from OPTUM in a regular amount that is reported on a W-2 form. The Debtor is not an owner of OPTUM, is not an officer or director of the company, and is not in a managerial position. Can this sort of routine employment constitute commercial or business activity? One court, referring to what it called the "exceptionally broad scope of the Section

1182(1)(A) 'commercial or business activities' requirement," suggested that virtually all private sector wage earners may be considered as engaged in commercial or business activities. *Ikalowych, supra*, 629 B.R. at 286.

The Court questions that conclusion because it does not believe that the ordinary meaning of the phrase "commercial or business activities" encompasses an employee who is in an employment relationship with an employer – at least where the employee has no ownership or other special interest with the employer. That is to say, the Court does not believe that in common language an individual who has a job as an employee for someone else would be understood as thereby engaging in a commercial or business activity. *See also, e.g.*, 11 U.S.C. §1304(a) ("A debtor that is self-employed and incurs trade credit in the production of income from such employment is engaged in business.") To instead read the phrase "commercial or business activities" as broadly as the *Ikalowych* court, threatens to virtually drain it of any meaning. If any person who is an employee is thus engaging in commercial or business activities, and thus potentially eligible to proceed under Subchapter V, why limit it there? What about a debtor whose only source of income is social security – cannot such a person nonetheless be said to be engaging in commercial or business activity by purchasing food and gasoline on a regular basis, and therefore potentially be eligible to proceed under Subchapter V?

Subchapter V is entitled "Small Business Debtor Reorganization" and the definition of who is eligible to use it must be construed in that context. The common use of language does not equate ordinary employment with a small business, and therefore the Court finds that the Debtor's employment by OPTUM does not constitute engaging in commercial or business activities

16

within the meaning of *Section 1182(1)(A)*.[5] The Debtor has failed to meet her burden of proof to show that she is presently engaged in commercial or business activities, and she is thus not eligible to proceed under Subchapter V.

### (B)    Whether at least 50% of Debtor's debt arose from her commercial or business activities

As a separate ground for denying the Debtor the ability to continue under Subchapter V, NLI and the UST both argue that she does not meet the requirement that at least 50% of her debt arose from her commercial or business activities. The Parties have stipulated that as of the date the petition was filed the Debtor's total debt was $1,095,439.63. *Stipulation* at ¶24. Debtor would thus have to show that at least $547,719 of this debt arose from her commercial or business activities.

---

[5]

Even if the Court were to adopt the broad reading of "commercial or business activities" as espoused by *Ikalowych*, that would not help the Debtor here. The court in that case stated:

> Notwithstanding the seemingly radical nature of the Court's foregoing legal conclusion, that does not mean that every private sector wage earner is eligible for relief under Subchapter V of the Bankruptcy Code. Not at all. There is still another hurdle under Section 1182(1)(A) which is difficult to meet and which severely limits the use of Subchapter V for individuals: "not less than 50%" of the Debtor's "aggregate noncontingent liquidated secured and unsecured debts" must have arisen from "the commercial or business activities of the [D]ebtor." The typical hamburger artist, earning just minimum wage, will almost never be putting his own capital at risk and incurring debts which arise from his work. So, Subchapter V will not be for everyone.

629 B.R. at 287. Likewise here, if the Court were to deem the Debtor's employment with OPTUM as sufficient to establish that she was presently engaged in commercial or business activities, she would then be unable to meet the 50% debt requirement because very little, if any, of her debt arose from that employment.

Of the total amount of debt, the Debtor conceded in her pretrial narrative statement that $151,194.13 is consumer debt, and she asserted that the remainder is business debt.[6] There are three components to the alleged business debt: (1) $352,578.77 owed to NLI; (2) $556,991.01 owed to the IRS;  and, (3) $48,503.37 owed to the Pennsylvania Department of Revenue ("DO").  *See* Doc. No. 69 at 4.

The Movants do not seriously dispute that the debt owed to NLI should be considered as business debt.  It stems from the loan that was secured from PNC to acquire the 602 W. Center St. property and launch the debtor's former medical practice, and the personal guarantee and mortgage on her Residence that the Debtor was required to give.  The Court would note, however, that the Parties have stipulated that the amount owed to NLI includes $11,678.24 in real estate taxes on the Residence that were advanced by NLI.  *See, Stipulation* at ¶21.  The Debtor herself acknowledges in her pretrial narrative statement  that other unpaid real estate taxes on the Residence in the amount of $19,011.11 are consumer debt, so there is no reason the real estate tax advances paid by NLI should be considered business debt.  Deducting the advanced taxes from the total NLI debt means that $340,900.53 of the NLI debt can be considered as arising from her commercial or business activities.

The Parties vigorously dispute how the IRS debt should be treated, with the Debtor claiming it is business debt and Movants arguing that it represents a personal tax obligation of the

---

[6]

Debtor's pretrial narrative statement shows total debt of $1,109, 267.56, which is inconsistent with the stipulated amount of $1,095, 439.63 by an amount of $13,827.93.  No explanation for this discrepancy was provided, but it does not impact the Court's analysis or conclusion.

Debtor that cannot be considered as business debt.  The parties have not pointed the Court toward any legal authority as to how a personal income tax obligation should be treated in terms of its nature as being a business debt or something else in the context of Subchapter V, nor has the Court found any such authority in its own research. Similar questions do arise in other settings, however, and do shed some light on the issue.

For instance, under 11 U.S.C. §707(b) a court may dismiss or convert a Chapter 7 case filed by a debtor "whose debts are primarily consumer debts" if it finds that granting relief to the debtor would be an abuse of the bankruptcy process.  "Consumer debt" is defined in the Code as debt incurred by an individual primarily for "a personal, family, or household purpose."  11 U.S.C. §101(8).  In *In re Brashers*, 216 B.R. 59 (Bankr. N.D. Okl. 1998) the court was faced with the question of whether income tax debt owed by the debtor  constituted consumer debt within the meaning of *Section 707(b)* and it concluded that the income tax debt was not consumer debt, but was also not business debt either.  Citing with approval to the analysis employed by the court in *In re Stovall*, 209 B.R. 849 (bankr. E.D. Va. 1997), the Brasher court found that:

> ... there are (1) consumer debts which fall within the definition of § 101(8); (2) business debts, or debts incurred with a "profit motive," which are non-consumer debts; and (3) other non-consumer debts that are not incurred with a motivation for making a profit. Personal income taxes fall within the third category.

216 B.R. at 61.  This approach appears to be a reasonable one, and if adopted here by the Court with respect to Subchapter V eligibility would clearly result in the Debtor failing to meet the requirement that at least 50% of her debt be related to her commercial or business activities since all of her tax

19

debt would be excluded from consideration as commercial or business debt. Such a finding would appear appropriate under the circumstances of this matter.[7]

Instead of doing that, however, for the sake of argument the Court will assume that the Debtor is correct that a personal income tax obligation can potentially be considered a business debt for purposes of Subchapter V eligibility and proceed to analyze this Debtor's tax debt on that basis. As a first step in considering the status of this debt  all amounts owed for periods after the medical practice was sold must be deducted because those could not possibly be considered as arising from commercial or business activities since those activities had ceased. A review of the IRS Proof of Claim, Exhibit R-1 identifies tax and related interest  debt  from years 2016, 2018, 2019 and 2020 – all after the medical practice had ceased operating. The amounts for those years total $71,157.31. The remaining tax-related debt is for years 2000 through 2004 and  2008 through 2014, years during which the medical practice was operating, and it totals $485,833.70. The Court must determine whether any of that tax debt should be found to have arisen from commercial or business activities of the Debtor.

---

[7]

The Court must point out, however, that even if the evidence had established that the Debtor was a W2 employee of the Professional Corporation for all or some of the time in question, rather than an independent contractor,  it is difficult to see how that would strengthen the case for treating the tax obligations she incurred during such time period as commercial or business debt. Any attempt to shift blame to the Professional Corporation for not having made tax withholdings from the Debtor's pay would face a quick rejoinder that it was the Debtor herself who owned and controlled the Professional Corporation, and who was therefore ultimately responsible for the failure to withhold. Such a response would be a persuasive  counter to the Debtor's argument since to find otherwise would open the door for the possibility of mischief and gamesmanship by debtors. Such a result would not be accepted lightly by the Court, and to avoid it the Court would likely formally adopt the position reached by the court in *Stovall*, *supra*, to the effect that personal income tax is *per se* not business debt. Since the evidence did not establish that the Debtor was an employee the Court need not reach that step in this case.

The Debtor presented Anderson's testimony regarding taxes.  During his direct testimony Anderson stated that his recollection was that the Debtor was a W-2 employee of the Professional Corporation during the time period when the medical practice was functioning, apparently with the implication that the Professional Corporation should have been making tax withholdings from the Debtor's pay.  *See Tr. Trans.* at 12:2 through 13:22.  However, under cross examination by the attorney for the UST, and based on the actual tax documents themselves rather than just his recollection,  Anderson acknowledged that at least for many of the years in question the Debtor was actually in an independent contractor relationship with the Professional Corporation and she should thus have been making estimated quarterly tax payments. This was established for the years 2001 through 2005 and 2013.  Anderson did not recall the Debtor ever having made such estimated quarterly payments.  The status of the Debtor with respect to the Professional Corporation in the remaining relevant years is unclear.  The Court cannot assume the Debtor was an employee of the Professional Corporation in those years based solely on Anderson's recollection given how faulty that proved to be as to the years on which he was cross-examined.

The record as to the IRS tax debt is thus far from complete.  As to the years in which the Debtor was an independent contractor for the Professional Corporation, it would have been her personal responsibility to pay her taxes, but it appears she failed to do so.  It is difficult to see how this failure by the Debtor can be said to have arisen from her commercial and business activities rather than from her own inaction to address taxes she owed on personal income.   If just the years for which independent contractor status was established are removed from the IRS debt as non-business debt, the total debt removed would be $238,805.04, and when that amount is subtracted

21

from $485,833.70 it yields a balance of $247,028.66 in IRS debt yet to be categorized as either

consumer or business. Based on the confusion and lack of evidence in the record as to that portion

of the tax debt the Court does not believe it can do so, and must therefore find that the Debtor has

failed to meet her burden of proof to show that any of the IRS tax debt should be treated as business

debt.

        The final debt at issue is that of the Pennsylvania Department of Revenue.  No

evidence whatsoever as to that debt was presented at the evidentiary hearing, and therefore, again,

the Debtor failed to meet her burden of proof and the Court cannot treat such debt as arising from

her commercial or business activities.

        Even giving her the benefit of the doubt on whether personal income tax debt can be

considered as business debt for Subchapter V purposes, the Debtor has therefore proven only that

$340,900.53 of her debt (the non-real estate portion of the NLI debt) arose from her commercial or

business activities.  As this is well below 50% of her total debt, the Debtor is ineligible to proceed

under Subchapter V.

### (C)   *Whether the case should be dismissed based on*
### *bad faith or inability to propose a feasible plan*

        As a final point, NLI seeks to have the case dismissed for cause, alleging that it was

filed in bad faith so as to prevent a sale of the Residence, because the Debtor has misused estate

assets since the filing, and because she cannot propose a confirmable plan. Although NLI's request

in this regard  does have  some merit, the Court does not believe it is sufficient to dismiss the case

22

at this relatively early stage.  In the first place, the Court does not find that the Debtor filed the case in bad faith.  The  Court has noted in the past on numerous occasions that, if avoidance of a threatened sheriff sale alone is considered to establish a bad faith filing, then a good portion of the current case docket would be in jeopardy.  NLI offered nothing else to show any bad faith in connection with the filing, so as of this time,  the Court rejects the contention that the case was filed in bad faith.

Second, it is true that the Debtor has expended substantial amounts on gambling since the case was filed.  This is troubling because the money for such gambling apparently came  from the Debtor's post-petition OPTUM earnings, which is property of the estate.  The Debtor explained that she has been very restricted in what she has been able to do prior to the filing due to Covid-19 restrictions, and she needed some recreational outlet.  The Court does not condone the large expenditures but they are at least understandable.  The Court will overlook the Debtor's prior failings in this regard, but will consider that she  has now been put on notice that any future unreasonable expenditures for gambling or other non-necessary, luxury  activities while she is in bankruptcy will not be viewed favorably by the Court, and may result in severe consequences including case dismissal.

Finally, the Court is not prepared at this time to dismiss the case on the grounds that Debtor cannot propose a confirmable plan.  Her prior plan was proposed on the basis that the provisions of Subchapter V would apply.  Now that the Court has issued its ruling to the contrary, it is only fair that the Debtor be given an opportunity to file an amended plan in light of that ruling.

23

It may be that the Debtor will be unable to propose a feasible plan, but that remains to be seen.   The

Court will therefore deny NLI's motion to dismiss the case for cause, without prejudice.

      An appropriate order follows.

Dated: December 14, 2021

                    Thomas P. Agresti, Judge
                    United States Bankruptcy Court

Case administrator to serve:
      David Fuchs, Esq.
      Norma Hildenbrand, Esq.
      Beverly Weiss Manne, Esq.
      John Melaragno, Esq.
      Debtor